UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

JANETTE M. ILIFF,                        )
                                         )
         Plaintiff,                      )
                                         )
    v.                                   )        CIVIL NO.  3:15cv153
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of the               )
Social Security Administration,          )
                                         )
         Defendant.                      )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits as provided for in the Social Security Act.  42 U.S.C. § 401 *et seq*.  Section

205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a

certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based.  The court shall have the power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ."  42 U.S.C. §405(g). The law provides that an applicant for disability insurance

benefits must establish an "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to last for a

continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C.

§423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.

2.      The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 8, 2011 through her date last insured of December 31, 2013 (20 CFR 404.1571 *et seq.*)

3.      Through the date last insured, the claimant had the following severe impairments: degenerative disc disease lumbar spine; status post left foot tarsal tunnel release on 8/24/2011; status post left foot tarsal tunnel release on 9/19/2013; and neuropathy lower extremities (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except lift/carry 10 pounds occasionally and lesser weights frequently; sit 6 hours in an 8-hour workday; stand/walk 2 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, or crouch; never kneel or crawl; occasionally use the left foot to operate foot controls; avoid concentrated exposure to wetness, including wet, slippery, uneven surfaces; and avoid concentrated exposure to hazards, such as unprotected heights and dangerous machinery.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on March 4, 1963 and was 48 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability while the claimant was a younger individual age 45-49, because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant had transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual

functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed, while the claimant was a younger individual age 45-49 (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

12.     Considering the claimant's age, education, work experience, and residual functional capacity, the claimant had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569(a) and 404.1568(d)).  As of March 4, 2013, the claimant attained age 50, or was closely approaching advanced age.

13.     The claimant was not under a disability, as defined in the Social Security Act, at any time from March 8, 2011, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

(Tr.  21-31).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Plaintiff filed her opening brief on January 4, 2016.  On April 12, 2016,  the defendant filed a memorandum in support of the Commissioner's decision.  Plaintiff has not filed a reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled.  See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

The following steps are addressed in order:  (1)  Is the claimant

presently unemployed?  (2)  Is the claimant's impairment "severe"?
(3)  Does the impairment meet or exceed one of a list of specific
impairments?  (4)  Is the claimant unable to perform his or her
former occupation?  (5)  Is the claimant unable to perform any other
work within the economy?  An affirmative answer leads either to
the next step or, on steps 3 and 5, to a finding that the claimant is
disabled.  A negative answer at any point, other than step 3, stops
the inquiry and leads to a determination that the claimant is not
disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162

n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).  From the nature

of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff filed an application for DIB in July 2012, alleging disability  beginning March

2011.  The Agency denied Plaintiff's application initially and upon  reconsideration, and Plaintiff

requested a hearing.   In October 2013, an Administrative Law Judge (ALJ) held a video hearing

during which Plaintiff, who was represented by an attorney, and a vocational expert testified.  In a

January 2014 decision, the ALJ found that Plaintiff retained the residual functional capacity

(RFC) to perform a reduced range of sedentary work.  See 20 C.F.R. § 404.1520.  The Appeals

Council denied Plaintiff's request for review in February 2015 (Tr. 1-3), thereby making the ALJ's

decision the final decision of the Commissioner.  20 C.F.R. § § 404.1555, 404.1581.

Plaintiff testified that she was born on March 4, 1963 and was 50 years old on the date of

the hearing.  She lives with her husband and her 13 year old son in a single-level home She is 5'5"

tall and weighs 155 pounds.  She completed the 12th grade and is able to read and write.  She has

never had any additional vocational training.  Plaintiff stated that she has not worked since March

2011.  Her most recent work was for Dollar General as a cashier/stocker.  She was also

considered fourth key management.  Her job required her to run the cash register, stock merchandise on the shelves, open and close the store and deal with the money.  She estimated that the most she had to lift and carry was about 20 pounds  She was mostly on her feet when performing her job.  Before she worked at Dollar General, she worked for Adkev operating a plastic injection molding machine.  That job required her to lift and carry 10 to 15 pounds and she was required to be on her feet the entire day.

Prior to working for Adkev, Plaintiff ran her own licensed day care.  Her duties included cooking meals, watching the children, and taking care of them.  She stated that she typically had about five children in the summer months but she also had some part-time after school and at other times.  She estimated the most she had to lift was probably about 25 pounds.  She usually spent half the day on her feet and half the day sitting.  In 1998 and 1999  she worked for two printing companies.  Her duties involved running the printing machines and sometimes cutting paper.  The most she had to lift or carry was approximately 30 pounds.  The job required her to be on her feet the entire day.

Plaintiff testified that she is unable to work because of problems with her spine.  She has bulging discs, herniated discs and "like a hole or something" in the spinal cord in the cervical area.  She also has issues with the nerves in her feet.  They are pinched off and she has tarsal tunnel syndrome.  She reported that her conditions cause her pain in her neck, shoulders, back, hips and feet.  The pain is always there and she described it as stabbing, burning and severe.   She has previously received injections in her neck and feet but they did not always provide relief.  She stated that she had surgery on her left foot the week before the hearing and even with all of the

treatment she has received, she believes her conditions are getting worse.

Plaintiff testified that being on her feet, bending, and stooping makes her pain worse. The only thing that gives her some relief is to lie down with a pillow under her neck and a pillow propping up her feet. She frequently lies down and elevates her legs above her heart. She is currently on medication for her thyroid, high blood pressure, potassium issues, nerve pain, muscle pain, and overactive bladder. In addition, she is on hormone replacement, B12 medication, Omeprazole, and inhalers for her COPD. Some of her medications make her very tired . They also cause severe dry mouth.

Plaintiff stated that she sometimes did household chores such as dusting and straightening up the house. However, she could only do an activity for a half an hour before needing a break She then has to rest for 15 to 20 minutes. She was able to prepare meals but only a couple of times a week. She occasionally plays cards but she does not have any hobbies. She has not been on vacation in the last two and a half years. Her husband looks after the dog. She occasionally drives to her doctor's appointments but she has not been out shopping in a while. She does not attend parent/teacher meetings for her son. She also does not do any outside chores such as mowing the lawn or planting a garden.

Plaintiff estimated that she could lift or carry not much more than five pounds repetitively; however, she would not be able to lift that much several times an hour over a two hour period . She could walk about one small town block before needing to stop and take a break. She is not able to sit very long before needing to stand. She noted that since she was on crutches she was forced to stay in her seat throughout the hearing. Typically, she will sit for

about 20 minutes and then lie down.  She cannot bend at the waist very well and she is unable to squat.  She has difficulty using her hands to grip, feel and manipulate things because they lock up on her.  She is most comfortable when lying down and spends approximately 90% of her day lying down.  She has difficulty sleeping.

The medical evidence of record shows that on January 4, 2011, Plaintiff presented to Gregory Schweikher, DPM, at Lafayette Podiatry with complaints of generalized bilateral foot pain.  It was noted that she was scheduled for an epidural injection with pain management on January 18, 2011 and any further treatment would be delayed until after the injection.  She returned to Dr. Schweikher on February 8, 2011 for a follow-up of her  bilateral plantar fasciitis.  She complained that her pain continued.  On exam, she had positive  Tinel's sign in the porta pedis bilaterally as well as pain with palpation.  On February 10, 2011, x-rays of the lumbar spine showed moderate facet sclerosis and  hypertrophy at L5-S1.  The overall impression was moderate facet degenerative changes at L5-S1.

On April 21, 2011, Plaintiff continued to complain of the signs and symptoms of tarsal tunnel compression neuritis bilaterally.  She again had a positive Tinel's sign in the porta pedis bilaterally.  She was administered injections in the peripheral nerve at the porta pedis bilaterally.  On May 5, 2011, Plaintiff reported to Dr. Schweikher that she noticed improvement for one week after the injection but then the pain returned.  An exam showed, among other things, positive Tinel's sign in the porta pedis bilaterally.  She was diagnosed with plantar fasciitis, right greater than left.  It was noted that her treatment would consist of bilateral injections in the peripheral nerves at the porta pedis.

On May 20, 2011, Plaintiff reported that her last injections were not effective. An exam revealed a positive Tinel's sign bilaterally proximal to the porta pedis/abductor hallucis. She was diagnosed with bilateral tarsal tunnel syndrome and bilateral foot injections were administered. On June 3, 2011, she had a follow-up appointment and reported continued cramps. She stated that the previous injections had barely helped. Dr. Schweikher noted that it appeared that each successive set of injections had been less effective. On exam she had a positive Tinel's sign in the porta pedis bilaterally and pain on palpation in the medial calcaneal tuberosity. She was again diagnosed with bilateral tarsal tunnel syndrome.

On July 18, 2011, Plaintiff presented to Nicholas Costidakis, DPM, due to bilateral arch pain in her feet. She reported pain with ambulation and post-static dyskinesia. She described the pain as sharp and aching that was intermittent. She experienced pain both with and without her shoes and stated it was aggravated by activity. On exam, she had pain with ambulation and she had plantar fasciitis in both feet. She also had pain on palpation of her bilateral arches. Dr. Costidakis diagnosed bilateral plantar fasciitis.

On August 1, 2011, an MRI of the left foot showed severe edema and atrophy of the quadratus plantae muscle, moderate edema and mild atrophy within the abductor hallucis muscle, and mild edema in the digitorum brevis and abductor digiti minimi muscles. There was bipartite medial sesamoid of the first metatarsophalangeal joint with underlying cystic changes and edema. There was also bifid appearance of the plantar branch of the peroneus longus tendon and a small amount of tenosynovial fluid about the posterior tibialis tendon. John Fiederlein, MD, interpreted the MRI findings as suggestive of neuropathy of the tibial nerve proximal to its

branching and therefore consistent with tarsal tunnel syndrome. Alternatively, there might be a multifocal process involving both the medial and lateral plantar nerves. The same day, an MRI of the right foot showed severe edema and atrophy of the quadratus platae muscle, mild edema and atrophy in the abductor hallucis muscle and flexor digitorum brevis muscle, and minimal edema in the abductor digiti minimi muscle. There was thickening of the proximal 3cm of the central cord of the plantar fascia with overlying fat pad edema and edema in the subjacent calcaneus. There was also bipartite medial sesamoid of the first metatarsophalangeal joint with underlying edema. Fluid was seen in the internal bursal fluid between the second and third metatarsal heads.

In addition, a small bone fragment was present about the medial malleolus, which was likely reflective of a remote avulsion injury. Inhomogeneous bone marrow signal was seen within the distal tibia, which like represented islands of hematopoietic bone marrow. There was also tenosynovial fluid around the anterior tibialis tendon at the level of the navicular, which was consistent with tenosynovitis.

On August 22, 2011, Plaintiff was given medical clearance for a non-motorized wheelchair since she would not be able to bear weight on her lower extremities and be unable to ambulate due to surgery on her foot. On August 24, 2011, Dr. Costidakis performed tarsal tunnel release surgery on Plaintiff's left foot due to tarsal tunnel syndrome.

On September 12, 2011, Plaintiff reported the middle of her incision was red and possibly infected. On September 14, 2011, Plaintiff phoned Dr. Costidakis's office due to bleeding and redness around her incision every time she showered. She also said the area was very red and black.

On October 4, 2011, Plaintiff presented to Dr. Costidakis for a post-op visit and wound care. She described her pain as stinging and it was exacerbated by walking and direct pressure. The sites affected included the left ankle medial aspect. On exam, she had edema on the left. She had a healing ulcer on the left medial aspect of the calcaneus bone. Findings included granulation, fibrotic tissue, and exposed dermis. Her treatment plan included crutches, a below-knee walking boot, and partial weight bearing.

On October 13, 2011, she returned to Dr. Costidakis because her surgical wound was not healing. She was compliant with treatment but there had been poor symptom control. Active problems were listed as cramp in limb and mid back pain. An exam revealed an ulcer (the incision site remained open but clean), and pain on palpation of the foot. She was again diagnosed with tarsal tunnel syndrome.

On December 12, 2011, Plaintiff was released from wound care but she reported that her toes were feeling stiff. She had tenderness around the incision site. Lower extremity sensory evaluation revealed tibial nerve abnormalities (hypesthesia). Dr. Costidakis noted that she was progressing slowly. She had an antalgic gait in her walking boot and decreased response to light touch. Her diagnosis was tarsal tunnel syndrome.

On February 28, 2012, Plaintiff had a consultation with Douglas K. Blacklidge, DPM. She reported previous back surgery in 1992 and problems with her left foot persisting since 2008. She reported that even after her tarsal tunnel release was performed she has not had significant relief of her symptoms. She also had some wound healing complications. Most of her pain was now paresthesia along the plantar lateral foot more so than plantar medial but she did

have paresthesia along both the medial and lateral plantar nerves. An examination revealed localized venous stasis changes in the tarsal tunnel area, left greater than right. She had some paresthesia in the left plantar foot lateral plantar nerve more so than in the medial plantar nerve. The distal tarsal tunnel area and abductor hallucis muscle origin area was painful to compression and there was tingling on percussion. She also had mild hallux valgus deformity on the left ankle joint. Dorsiflexion was restricted with the knee extended more so than flexed. She also had some diffuse pain in the left dorsolateral lateral column.

Dr. Blacklidge diagnosed tarsal tunnel syndrome persisting status post previous attempted release with compression neuropathy in the lateral plantar nerve greater than the medial plantar nerve. There was questionable associated plantar fasciitis and lateral column overload. She also suffered from equinus.

On March 5, 2012, Plaintiff underwent an ankle/foot initial evaluation at Lafayette Rehabilitation Services. She complained of bilateral foot problems, left greater than right, for many years. She had surgery in August 2011 but it did not help. She reported that her pain increased with walking and even with just putting her feet on the floor. Her ankles felt weak and she was very cautions with walking over uneven ground. On exam, her gait was antalgic and she had decreased stance time on the left lower extremity. She was tender over her surgical incision and she had bilateral plantar fascia. After her evaluation, it was noted that she demonstrated significant deficits in bilateral ankle dorsiflexion and general left ankle motion and strength. She was diagnosed with bilateral equinus, plantar fasciitis, and tarsal tunnel syndrome.

On March 27, 2012, Plaintiff returned to Dr. Blacklidge. She reported that she had been

participating in physical therapy but her pain continued to persist.  She also complained that her ankle swelled as the day progressed.  On exam, there was evidence of continued tarsal tunnel syndrome especially at the lateral plantar nerve.  There was evidence of venous insufficiency and she had restricted ankle in dorsiflexion with the knee extended and pain on palpation of the plantar fascia origin.  She was diagnosed with tarsal tunnel syndrome with slight compression neuropathy in the lateral plantar nerve, equinus, and plantar fasciitis.

On April 27, 2012, Plaintiff went to the Pain Clinic due to long-standing lower back pain, neck pain, hip pain, bilateral posterior leg pain and severe burning in her feet.  It was noted she had a laminectomy in 1992 and she was currently undergoing physical therapy for her feet.  She described her pain as constant, sharp and annoying.   On exam, her lungs were diminished bilaterally.  Her gait was slow and guarded and standing up required a lot of time and effort.  She had a lack of lordotic curve.  Lumbar flexion was limited to 20 degrees with pain coming back up and extension was reduced to zero degrees due to pain.  Her thoracic back was tender, and the lumbar area, axially, was tender to palpation.  The thoracic and lumbar paraspinal muscles were tender to direct palpation.  Straight leg raise testing was positive bilaterally at 60 degrees.  Motor strength of the lower extremities was 3/5 bilaterally with hip flexion, knee extension, and knee flexion.  Her sacroiliac joints were tender bilaterally.

Leta Bennison, CFNP, diagnosed lumbago, lumbar degenerative disc disease, lumbar facet arthropathy, lumbar radiculopathy, failed back syndrome status post lumbar surgery in 1992, bilateral hip pain, cervical spondylosis, cervical degenerative disc disease, tobacco use disorder, asthma, hypertension (resolved), leg cramps/toe cramps, status post thyroidectomy/

non-toxic goiter, urge incontinence, fatigue (improved), hypokalemia (all electrolytes were normal on January 27, 2011), and fibromyalgia (18/18 trigger points were tender).

On May 22, 2012, Plaintiff presented to Dr. Blacklidge with continued foot pain. Her tarsal tunnel release had not been helpful and neither had her orthotics. On exam, she had continued pain in the plantar fascia and tarsal tunnel. On June 8, 2012, Plaintiff returned to Dr. Blacklidge with complaints of considerable bilateral foot pain. She had pain and paresthesia in the left foot tarsal tunnel area. She reported she was unable to sleep or maintain regular household duties but that her back currently was hurting worse than her feet. On exam, she had pain in the region of the tarsal tunnel. Dr. Blacklidge diagnosed tarsal tunnel syndrome versus lumbar spine radiculopathy versus both.

On June 19, 2012, Plaintiff presented to Timothy Fisher, MD, with multiple medical problems including chronic pain syndrome. Her chief complaint was of chronic worsening low back pain with bilateral sciatica and paresthesia of the feet. Her pain was moderate to severe and worse with certain movements. It limited her activity. Her feet felt numb and tingled at times. On exam, she moved gingerly when getting up on to the exam table. She had mid lumbar spine tenderness and could straight leg raise to only 5 degrees bilaterally due to back pain. Dr. Fisher diagnosed bilateral feet paresthesia, chronic low back pain with bilateral sciatica, and chronic tobacco dependence. X-rays showed disc space narrowing at L5-S1, L4-L5, and L3-L4 and the overall impression was multilevel degenerative discogenic changes with no acute osseous abnormality.

On June 27, 2012, Plaintiff underwent a nerve conduction study and electromyography.

She presented to the study with numbness, paresthesia, and pain involving her bilateral feet. She also complained of lower back pain. Khaled Hammoud, MD, concluded it was an abnormal study that demonstrated a moderate axonal sensorimotor neuropathy in the lower extremities.

On July 16, 2012, Plaintiff presented to Margaret Laycock, MD, for evaluation and treatment of peripheral neuropathy. She continued to have low back pain that radiated from the back to the feet. She also complained of paresthesia in the feet. She had sharp pain in her legs and feet and the soles of her feet hurt. She had cramps in her feet and some cramps in her hands and pain in the forearms. Dr. Laycock noted that her plain films of the lumbosacral spine showed diffuse degenerative changes. An exam revealed decreased range of motion of the cervical spine in all directions of movement. She was tender to palpation of the cervical and lumbosacral paraspinous musculature. She had decreased pinprick sensation in the right index finger. Reflexes were diffusely diminished in the bilateral upper and lower extremities. The final impression was extremity pain of uncertain etiology, neck pain (degenerative joint disease), and low back pain.

On July 30, 2012, Plaintiff underwent an MRI of the lumbar spine due to bilateral upper and lower extremity numbness. It showed mild disc desiccation at L3-4 and L4-5. At L3-4, there was an annular disc bulge. At L4-5 there was moderate diffuse annular disc bulging with a superimposed moderate sized central disc protrusion that indented the ventral aspect of the thecal sac and produced narrowing of the central canal. At L5-S1 there was minimal annular disc bulging but a laterally bulging disc produced leftward foraminal narrowing. The same day, an MRI of the cervical spine revealed anterior osteophytic spurring at C4-5 and C5-6 and the discs

were mildly desiccated. There was a tiny syrinx at the C6-7 level. At C6-7 there was also a broad-based left paracentral protrusion and disc. On September 6, 2012, Plaintiff returned to Dr. Laycock for a follow-up examination. Dr. Laycock concluded that the EMG was suggestive of an L5 radiculopathy. Plaintiff was noted to be holding the left side of her back with her hands and she stood to rise slowly. She was diagnosed with chronic back pain and neck pain and a cervical syrinx.

Also on September 6, 2012, Plaintiff underwent a consultative examination with James Auckley, MD. She reported that she suffered from degenerative disc disease, herniated discs, osteoarthritis, chronic back pain, neuropathy, plantar fasciitis and tarsal tunnel. She has difficulty sitting, standing, and walking and she stated she was unable to do much of anything. The muscles on the right side of her body were weak and she suffered from burning and cramping in her bilateral feet. She is at risk for falling often and she has previously been diagnosed with fibromyalgia. Dr. Auckley noted that she moved slowly and poorly, especially with the left leg. He diagnosed degenerative disc disease and degenerative joint disease, hypothyroidism post op, chronic obstructive pulmonary disease/asthma with a history of tobacco abuse, gastroesophageal reflux disease, and a history of hypertension.

Range of motion testing revealed deficits with cervical extension, lateral flexion, and bilateral rotation. Lumbar extension and bilateral lateral flexion was also decreased. In addition, knee flexion was reduced as was bilateral hip abduction, flexion, internal rotation, external rotation, and extension. Ankle dorsiflexion and plantar flexion were reduced to zero. Dr. Auckley opined that she was able to sit for at least two hours and handle objects for at least two

hours but she was unable to stand or walk for at least two hours, lift or carry less than 10 pounds frequently, or lift or carry more than 10 pounds occasionally.

On October 4, 2012, at a physical therapy session at Indiana University Health Arnett, Plaintiff reported that she had an episode where she became lightheaded and her vision became like a "kaleidoscope." She continued to be lightheaded. She also reported that she did not feel physical therapy was helping very much. It was noted that she was moving very slow and holding on to objects and walls when walking in and out of therapy. Erin Wohlfert, PT, assessed that Plaintiff continued to exhibit decreased flexibility/strength/posture that led to altered function.

On January 29, 2013, Plaintiff returned to Dr. Schweikher due to pain and paresthesia in her left foot. She complained of heel pain, and paresthesia to her heel and plantar foot. She had pain in all shoes, when lying in bed, and post rest. She continued to use her orthotics but was otherwise living with the pain. On exam, she had a positive Tinel's sign at the porta pedis, left greater than right. She had paresthesia that radiated to the medial heel and lateral plantar foot and pain on palpation of the medial calcaneal tuberosity. She was diagnosed with tarsal tunnel syndrome and plantar fasciitis of the left foot.

On March 27, 2013, she complained of pain in her bilateral medial heels. The pain had increased significantly in intensity, frequency and duration over the past two months. On exam, she had a positive Tinel's sign with percussion / palpation of the porta pedis, left greater than right, as well as paresthesia to the digits. She also had mild to moderate pain on palpation to the medial calcaneal tuberosity, left greater than right. Dr. Schweikher diagnosed her with bilateral

tarsal tunnel syndrome and administered injections in the medial plantar and lateral plantar nerves at the porta pedis bilaterally.

On June 5, 2013, Plaintiff complained of increased pain and paresthesia to the bilateral heel and toes. She again had a positive Tinel's sign with palpation of the porta pedis bilaterally and pain on palpation of the medial calcaneal tuberosity bilaterally. Dr. Schweikher diagnosed bilateral tarsal tunnel syndrome. She again underwent injections in both feet.

On August 30, 2013, Plaintiff underwent a consultation regarding another surgery on her left foot. She continued to complain of pain and paresthesia radiating to the heel and the mid arch bilaterally. On exam, she had a strong Tinel's sign with palpation of the porta pedis on the left as well as Tinel's sign present with percussion of the tibial nerve on the right. Dr. Schweikher diagnosed bilateral tarsal tunnel syndrome and administered injections into the right and left tarsal tunnel.

On September 3, 2013, Dr. Schweikher opined that Plaintiff could stand/walk for less than 15 minutes at one time and for a total of less than 60 minutes in a workday. She could sit for six hours at one time for a total of six hours in a workday. She could lift less than five pounds occasionally and less than five pounds frequently. She could rarely bend, stoop, or balance. She would need to elevate her legs during an eight hour workday. He opined that the pain she suffers from is severe and that her experiences of pain or other symptoms would be severe enough to occasionally interfere with attention and concentration. Lastly, he opined that, on average, she would be absent from work as the result of her impairments or treatment more than four days per month.

On September 12, 2013, Leta Bennison, FNP, opined that Plaintiff would need to elevate her legs during an eight hour workday. She believed that Plaintiff suffered from severe pain and that her experiences of pain or other symptoms were frequently severe enough to interfere with attention and concentration. Lastly, Plaintiff would be absent from work, on average, more than four days per month as a result of her impairments or treatment.

On September 18, 2013, Plaintiff presented to Dr. Schweikher for a preoperative appointment. On exam, she had positive Tinel's sign with percussion to the tibial area and a strong Tinel's sign with percussion to the porta pedis on the left. She also had paresthesia that radiated to the medial heel and lateral plantar foot, and pain on palpation to the medial calcaneal tuberosity on the left. She was diagnosed with tarsal tunnel syndrome.

On September 19, 2013, Plaintiff underwent another tarsal tunnel release surgery on her left foot. On September 27, 2013, she returned to Dr. Schweikher. She complained of pain at times and that she tried to keep her left foot elevated. She was ambulating on crutches and was not to bear weight on her left foot. She had mild edema. Dr. Schweikher wanted her to continue to not bear weight on her left foot.

In support of remand or reversal, Plaintiff argues that the ALJ improperly discredited the opinion of her treating physician, Dr. Schweikher. Pursuant to the regulations, a treating source opinion is entitled to controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *see also Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (ALJ reasonably

discounted opinion that was not supported by doctor's own treatment notes); *Luster v. Astrue*, 358 F.App'x 738, 740 (7th Cir. 2010) ("This court upholds all but the most patently erroneous reasons for discounting a treating physician's assessment").  In determining the weight of medical source opinions not entitled to controlling weight, an ALJ will evaluate the following factors: the length, nature, and extent of treatment relationship; evidence in support of the opinion; consistency with the record as a whole; and the physician's specialization.  20 C.F.R. § 404.1527(c)(2)-(5).  Although the regulations provide factors for weighing physician opinions, they do not mandate that an ALJ must always adopt the opinion of a treating source.  20 C.F.R. § 404.1527(c).

 Plaintiff argues that the ALJ erred by not giving Dr. Schweikher's opinion "controlling weight".  Plaintiff also argues that the ALJ failed to provide "good reasons" for assigning "little weight" to Dr. Schweikher's opinion.

Dr. Schweikher completed a form in September 2013, in which he opined that Plaintiff could stand/walk less than 15 minutes at one time and for 60 minutes total in a workday; sit 6 hours at one time and for 6 hours total in a workday; occasionally or frequently lift less than 5 pounds; and rarely bend, stoop, and balance.  Dr. Schweikher also opined that Plaintiff needed to elevate her legs during an 8-hour workday.  Dr. Schweikher further opined that Plaintiff suffered from pain that was severe, that her pain or other symptoms were severe enough to occasionally interfere with her attention and concentration, and that she would be absent more than four days per month.

In his decision, the ALJ discussed Dr. Schweikher's opinion and gave it "little weight" because it was not consistent with the evidence, including Dr. Schweikher's own treatment

records and other evidence. The ALJ acknowledged that Dr. Schweikher treated Plaintiff for her tarsal tunnel release and noted his treatment during several visits. The ALJ also found that Dr. Schweikher's opinion was not consistent with Dr. Schweikher's findings and with Plaintiff's statements one week post-op that her pain was 3-4 out of 10 with medications. The ALJ also noted that there were no indications in Dr. Schweikher's records regarding a need for Plaintiff to keep her legs elevated, other than during the post-operative period when Plaintiff reported she was trying to do so.

Further, the ALJ found that Dr. Schweikher's opinion was inconsistent with the objective evidence in the record. The ALJ discussed and weighed the record evidence earlier in the decision before weighing the medical opinions, and cited evidence that was inconsistent with Dr. Schweikher's opinion. For example, in September 2012, Plaintiff was seen by Dr. James Auckely for a physical consultative examination. Plaintiff reported a history of hypertension that was not well controlled, but also reported she was not taking medications for it. Dr. Auckely found that Plaintiff was able to get on and off the table without difficulty, had no ulcerations or edema, had 5/5 muscle strength with intact sensation, and had negative straight leg raises. Plaintiff also had a normal gait and station not using an assistive device, was able to walk on her heels/toes, and bend all the way forward, was able to squat, but moved slowly and poorly, especially her left leg.

Additionally, Plaintiff also saw Dr. Margaret Laycock in September of 2012. Dr. Laycock noted Plaintiff had some improvement after pain clinic treatment, but had been wanting opioid-type medications that were not an option because she failed to take the drug test in 2010. Dr. Laycock opined that the majority of Plaintiff's pain was coming from muscle spasm, and advised

that physical therapy was the best means for improvement in her chronic back pain symptoms. Clearly, the ALJ identified sufficient good reasons to discount Dr. Schweikher's opinion.

When summarizing the medical evidence, the ALJ discussed Dr. Schweikher's treatment notes, which were inconsistent with Dr. Schweikher's restrictive opinion that Plaintiff suggests shows she is disabled. The ALJ noted that Dr. Schweikher treated Plaintiff with corticosteroid injections in March 2013. Dr. Schweikher noted that findings had improved to mild in a follow-up visit in June 2013, gave Plaintiff corticosteroid injections again in June and August 2013, and performed a tarsal tunnel release of Plaintiff's left foot in September 2013. The ALJ pointed out that one week post-op, Plaintiff reported to Dr. Schweikher that her pain was 3-4 out of 10 with medications.

The ALJ also noted that there were no indications in Dr. Schweikher's own treatment records supporting his opinion that Plaintiff needed to elevate her legs, other than during the post-operative period when Plaintiff stated that she was trying to keep them elevated. The ALJ found when summarizing the medical evidence that there was no need to include a leg elevation requirement so soon after surgery consistent with the treatment record and improvement from her first tarsal tunnel release. Specifically, the ALJ noted that the record indicated that Plaintiff was off crutches, using a walking boot, and released to use gym shoes as tolerated four months after Plaintiff's prior tarsal tunnel release in 2011.

Plaintiff contends that Dr. Schweikher's findings do support his opinion and that the ALJ gave no examples of the inconsistencies between Dr. Schweikher's opinion and his findings. However, Plaintiff fails to show that the ALJ impermissibly considered Dr. Schweikher's

treatment notes. As discussed above, the ALJ's decision noted Dr. Schweikher's treatment records did not indicate Plaintiff needed to keep her legs elevated other than during the post-operative period, and thus the treatment records were inconsistent with Dr. Schweikher's opinion. The ALJ reasonably considered Plaintiff's treatment history with Dr. Schweikher, noted the lack of consistency between his opinion with other record evidence, and cited these factors in rejecting Dr. Schweikher's opinion. Clearly, the ALJ did discuss and cite Dr. Schweikher's treatment records, and Plaintiff fails to show how Dr. Schweikher's treatment records support his opinion. Plaintiff also ignores that the ALJ discounted Dr. Schweikher's opinion for other reasons in addition to noting that the opinion was inconsistent with his treatment records.

The ALJ's decision discussed and weighed the physical exam and diagnostic clinical findings in the record, and reasonably found the objective medical evidence was not consistent with Dr. Schweikher's restrictive opinion. For example, the ALJ noted Plaintiff's improvement after her August 2011 left foot tarsal release, and considered the medical findings and treatment records of Plaintiff's physician Nicholas Costidakis, D.P.M., after this procedure. While Dr. Costidakis diagnosed bilateral plantar fasciitis one month before Plaintiff's left foot tarsal tunnel release, Dr. Costidakis also found that Plaintiff had normal gait and 5/5 muscle strength. During Plaintiff's post-operative follow-up in October 2011, Dr. Costidakis noted that Plaintiff's condition was improving, musculoskeletal findings were negative, and he permitted partial weight bearing with crutches and a walking boot. Further, although Plaintiff reported that her toes felt stiff in December 2011, Dr. Costidakis found that Plaintiff's range of motion was as expected post-operatively, and permitted Plaintiff to use gym shoes as tolerated, showed her ankle

exercises to strengthen, and advised a 3-month follow-up appointment.

The ALJ also considered Plaintiff's diagnostic medical findings, including mild/moderate MRI, nerve conduction study, and EMG findings. A lumbar spine MRI in July 2012 showed mild to moderate degenerative discogenic findings. A cervical spine MRI that same day showed degenerate changes with small paracentral disc protrusion at C6-C7, but without focal neural impingement, and a tiny syrinx in the lower cervical cord that was noted to be "an incidental finding of doubtful clinical significance". In June 2012, a nerve conduction study showed moderate axonal sensorimotor neuropathy in the lower extremities, and an EMG of bilateral L4-5 and L5-S1 was unremarkable.

The ALJ also considered physical exam findings and treatment by Douglas Blacklidge, D.P.M., which primarily included recommendations for physical therapy, compression stockings, and rigid soled shoes. In February 2012, Dr. Blacklidge noted that Plaintiff reported pain along the plantar left foot, and paresthesias along both the medial and lateral plantar nerves. Dr. Blacklidge also observed that sensorium was mostly intact with some paresthesias in the plantar foot left lateral nerve, more than in the medial plantar nerve, no weakness or spasticity, and restricted ankle joint dorsiflexion. Dr. Blacklidge recommended aggressive stretching of the muscles and wearing shoes that did not flex at the midfoot. In March 2012, Dr. Blacklidge noted that Plaintiff had not purchased the shoes he recommended, and diagnosed tarsal tunnel syndrome, slight compression neuropathy lateral plantar nerve, and plantar fasciitis. Dr. Blacklidge recommended compression stockings, rigid soled shoes with elevated heel, and continued physical therapy. Dr. Blacklidge recommended a modification of Plaintiff's orthotic

device in May 2012, and noted that Plaintiff reported her back hurt more than her foot in June 2012.

The ALJ further considered the physical exam findings by Timothy Fisher, M.D., James Auckely, M.D., and Margaret Laycock, M.D.   In July 2012, Dr. Fisher observed that Plaintiff had normal strength and muscle tone, symmetric reflexes but diffusely diminished in the upper and lower extremities, gait and station within normal limits, normal free gait and base, normal toe and heel walk, and negative straight leg raise.  Consultative examining physician Dr. Auckely examined Plaintiff in September 2012, and observed that Plaintiff could get on and off the table without difficulty, had 5/5 muscle strength with intact sensation, no ulcerations or edema, and had negative straight leg raise.  Dr. Auckely also found decreased range of cervical spine extension and rotation, lumbar forward flexion, knee flexion, hip adduction, and ankle dorsiflexion and plantar flexion.  Dr. Auckely observed that Plaintiff moved slowly and poorly, especially her left leg, yet he also found that she had normal gait and station not using an assistive device, and was able to walk on her heels/toes, bend all the way forward, and squat.  That same month, Dr. Laycock noted that the majority of Plaintiff's chronic back pain was coming from muscle spasm, and that her options for treatment were physical therapy and pain management through a pain clinic. In light of all the above, this court finds that the ALJ reasonably discounted Dr. Schweikher's opinion because it was unsupported by the physical exam findings and other objective medical evidence.

Plaintiff argues that her previous tarsal tunnel release "clearly did not fix her problems and the relief it provided was only temporary," as she needed to "continually seek treatment for

her tarsal tunnel syndrome and have another tarsal tunnel release in September 2013" (Pl. Br. 25). However, Plaintiff does not show how her improvement after her first procedure and continuing treatment supports Dr. Schweikher's restrictive opinion. In discussing the medical evidence after Plaintiff's first tarsal tunnel release, the ALJ also noted that the evidence suggested noncompliance with her other doctors' recommendations. In February 2012, Dr. Blacklidge indicated that Plaintiff had no stretching exercises or physical therapy, and no compression stockings, and in March 2012, Plaintiff had not purchased the shoes recommended by Dr. Blacklidge the prior month. In March 2012, the physical therapist noted deficits in bilateral ankle dorsiflexion and left ankle general motion, but also noted that it was unclear whether Plaintiff had ever performed her home exercises.

Plaintiff cites medical evidence in support of her argument, but fails to show how the objective medical evidence supports Dr. Schweikher's opinion or how the ALJ erred in evaluating his opinion. Plaintiff's argument essentially asks this Court to re-weigh the evidence anew and resolve conflicts of fact that the ALJ already reasonably resolved, which it cannot do on appeal. *See Powers*, 207 F.3d at 434-35 (stating that because the Commissioner is responsible for weighing the evidence, resolving conflicts and making independent findings of fact, the court may not decide the facts anew, re-weigh the evidence or substitute its own judgment). Plaintiff also criticizes the ALJ's statement that Dr. Schweikher's opinion appeared to give greater walking limitations than are supported by Plaintiff's testimony. Even if the ALJ could have further clarified this reason and inquired how long it took Plaintiff to walk a block, the ALJ provided sufficient reasons to discredit Dr. Schweikher's opinion as discussed above. The

ALJ already reasonably considered the objective evidence, including evidence cited by Plaintiff, in determining not to adopt Dr. Schweikher's opinion.

Moreover, to the extent Plaintiff suggests that the ALJ was required to discuss or cite every piece of evidence in his decision, Plaintiff is wrong. As the Seventh Circuit has explained, the "ALJ is not required to discuss every piece of evidence but is instead required to build a logical bridge from the evidence to her conclusions." *Simila v. Astrue*, 573 F.3d 503, 513-16 (7th Cir. 2009). Here, the ALJ built a logical bridge between his decision and the evidence by evaluating the evidence in the record and explaining his rationale by citing the facts discussed above. Accordingly, it was reasonable for the ALJ to conclude that Dr. Schweikher's opinion was not consistent with the record.

In any event, Plaintiff testified that she can probably walk a small town block before taking a break and can stand maybe a half hour before having to sit down. She further testified that her activities of daily living include cooking meals a couple times a week, sweeping the floor, helping with laundry, watching television, using the computer to play games, go on Facebook, or look things up, playing cards and driving occasionally. As the ALJ noted, these activities are consistent with the residual functional capacity to sit 6 hours and stand/walk 2 hours in an 8-hour day. Thus Dr. Schweikher's opinion is not consistent with Plaintiff's own testimony and, further, her testimony supports the ultimate conclusion that she is not disabled because she can perform sedentary work.

In sum, the ALJ properly applied the regulations and considered several factors in discounting Dr. Schweikher's opinion. The ALJ reasonably declined to accept the opinion and

explained that it was not supported by Dr. Schweikher's own treatment notes or other record evidence.  Thus, the ALJ provided sufficient reasons for discounting Dr. Schweikher's opinion, and the decision will be affirmed.

<u>Conclusion</u>

On the basis of the foregoing, the decision of the Commissioner is hereby AFFIRMED.


Entered: June 15, 2016.


<u>s/ William C.  Lee</u><br>
William C. Lee, Judge<br>
United States District Court